Docusign Envelope ID: 99206170-892D-45F2-98C2-CF2EC1C2B54E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.　　　　　　　　　　　　　　　　　　　Case No. 25-cr-08

SHELTON K. THORTON,

        Defendant.

## AMENDED PLEA AGREEMENT

1.    The United States of America, by its attorneys, Brad D. Schimel, United States Attorney for the Eastern District of Wisconsin, and Katherine M. Halopka-Ivery, Assistant United States Attorney, and the defendant, Shelton K. Thorton, individually and by attorney John H. Bradley, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.    The defendant has been charged in one count of a fourteen-count indictment, which alleges violations of Title 18, United States Code, Section 2(a) and Title 21, United State Code 841(a)(1), 841(b)(1)(C), 841(b)(1)(E), and 846. The defendant is also charged in a one count information which alleges violations of Title 18, United States Code, Section 2(a), and Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(E), and 846.

3.    The defendant has read and fully understands the charge contained in the indictment and the information. He fully understands the nature and elements of the crime with which he has

been charged, and the charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to waive prosecution by indictment in open court.

5. The defendant voluntarily agrees to plead guilty to the following count set forth in full as follows:

**THE UNITED STATES ATTORNEY CHARGES THAT:**

Beginning in at least January 2021 and continuing until in or about April 2022, in the State and Eastern District of Wisconsin and elsewhere,

**SHELTON K. THORNTON**

knowingly and intentionally conspired with others, known and unknown to possess with the intent to distribute and to distribute a mixture and substance containing ketamine, a Schedule III controlled substance.

In violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(E), and Title 18, United States Code, Section 2(a).

6. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

**PENALTIES**

7. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: up to 10 years and $500,000. The count also carries a mandatory special assessment of $100, at least two years of supervised release, and up to life of supervised release.

8. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF INDICTMENT

9. The government agrees to move to dismiss the indictment at the time of sentencing.

## ELEMENTS

10. The parties understand and agree that in order to sustain the charge of conspiracy to possess with intent to distribute and distribute controlled substances, as set forth in the Information, the government must prove each of the following propositions beyond a reasonable doubt:

> First, the conspiracy existed; and
>
> Second, the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy.

## SENTENCING PROVISIONS

11. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

12. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

13. The defendant acknowledges and agrees that his attorney has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

14. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

### Sentencing Guidelines Calculations

15. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

### Relevant Conduct

16. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

17. The parties agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is 15,000 units of a mixture and substance containing ketamine, a Schedule III controlled substance.

Docusign Envelope ID: 99206170-892D-45F2-98C2-CF2EC1C2B54E

### Base Offense Level

18. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in the Information is 14 under Sentencing Guidelines Manual § 2D1.1(13).

### Acceptance of Responsibility

19. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a).

### Sentencing Recommendations

20. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21. Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

22. The government agrees to recommend a sentence up to 10 months' imprisonment.

### Court's Determinations at Sentencing

23. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

Docusign Envelope ID: 99206170-892D-45F2-98C2-CF2EC1C2B54E

24. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

### FINANCIAL MATTERS

25. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

26. The defendant agrees to provide to the Financial Litigation Program (FLP) of the United States Attorney's Office, upon request of the FLP during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLP and any documentation required by the form. The defendant further agrees, upon request of FLP whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest, cooperate in the liquidation of any such assets, and participate in an asset deposition.

### Fine

27. The government will not recommend that the Court impose a fine.

### Special Assessment

28.     The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

### **DEFENDANT'S WAIVER OF RIGHTS**

29.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

   a.   If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

   b.   If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

   c.   If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

   d.   At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

   e.   At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

30.     The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has

explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

31. The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

32. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

33. Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his conviction or sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim that (1) the statutes or Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the conduct to which the defendant has admitted does not fall within the scope of the statute or Sentencing Guidelines. This waiver does not extend to an appeal or post-conviction motion

8

based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily.

### Further Civil or Administrative Action

34. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

### MISCELLANEOUS MATTERS

35. The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which defendant is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, and the defendant understands that no one, including the defendant's attorney or the sentencing court, can predict to a certainty the effect of the defendant's conviction on the defendant's immigration status. The defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences, including the potential for automatic removal from the United States.

### GENERAL MATTERS

36. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

37. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

38. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

39. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## Further Action by Internal Revenue Service

40. Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charges alleged in the information.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

41. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. Alternatively, the government may, in its discretion, ask the Court to be released from specific obligations under this plea agreement to reflect the defendant's conduct if the defendant

commits a federal, state, or local offense punishable by a term of imprisonment exceeding one year or violates a material term of the plea agreement. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## **VOLUNTARINESS OF DEFENDANT'S PLEA**

42. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 12/5/2025

SHELTON K. THORNTON
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 12/5/2025

JOHN H. BRADLEY
Attorney for Defendant

For the United States of America:

Date: 12/5/2025

BRAD D. SCHIMEL
United States Attorney

Date: 12/5/25

KATHERINE M. HALOPKA-IVERY
Assistant United States Attorney

12

## ATTACHMENT A

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. These facts are based upon information provided by confidential informants, the anticipated testimony of cooperating sources and law enforcement agents, electronic surveillance, records obtained via grand jury subpoenas, and physical and electronic evidence seized throughout the investigation of the conspiracy. The information is provided for the purpose of setting forth a factual basis for the defendant's guilty plea. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## Overview

Since April of 2021, the Wisconsin Department of Justice-Division of Criminal Investigation (WI DOJ-DCI) along with the United States Postal Inspection Service (USPIS), Drug Enforcement Agency (DEA) and other law enforcement agencies have been investigating a national drug trafficking organization (DTO) linked to Xing Li, Kaiyu Huang, Shawn M. Senter, a.k.a. "Shaggy;" and others who engaged in the trafficking of ketamine and MDMA.

As part of the investigation, case agents conducted several controlled buys beginning in January 2022, executed several residential warrants, conducted phone extractions, controlled money drops, and employed other investigative tools. During the investigation, case agents seized over 3,500 gram of powder ketamine, 21,000 grams of liquid ketamine, 4,300 grams of MDMA, and 3,000 grams of marijuana; however, it is a conservative estimate that the DTO engaged in trafficking at least 65,000 grams of ketamine and 10,000 grams of MDMA. Further EISENHAUER and PERRY were also engaged in the trafficking of cocaine.

A. **Controlled Buys**

a. **January 12, 2022**

On January 12, 2022, CS 1 contacted WNUK through the "Signal" app to purchase two ounces of ketamine for $3,000. WNUK agreed to meet. At the buy location, CS 1 got into WNUK's vehicle. WNUK retrieved the drugs, approximately 59 grams, from inside his jacket pocket and handed it to CS 1 in exchange for $3,000 cash. On February 10, 2022, lab results concluded the white powder contained the presence of ketamine.

b. **February 21, 2022**

On February 21, 2022, CS 1 planned for another buy with WNUK. At the buy location, case agents arrested WNUK for narcotics sales and distribution. WNUK was in possession of 4 ounces of ketamine.

c. **September 29, 2022**

On September 29, 2022, CS 2 arranged a purchase of ketamine and repayment of their drug debt with BLANDIN. Case agents watched BLANDIN exit his residence, located at XXX2

XXXXX3 Rockfield Rd, Germantown, Wisconsin, and provide CS 2 with suspected ketamine in exchange for cash. Case agents later weighed and tested the controlled substance. The substance weighed 13.7 grams, and a laser scan indicated the substance was ketamine.

### d. November 16, 2023 Controlled Buy

On November 8, 2023, LI texted CS 3 about mailing the 250 grams of ketamine to CS 3. On November 16, 2023, LI texted CS 3 with a photo of a tracking parcel and indicated he only sent 100 grams to "see how it goes." LI also provided two addresses to mail the money for the drugs to in New York: Yan Lin Pei, XX3 Henry Street, Apartment X, New York, NY (This was identified as HUANG's address) and Chang Peng Li, XX-X9 Union Street, Flushing, NY. On November 17, 2023, case agents intercepted the drug parcel that contained 130 grams of ketamine (gross). Case agents obtained surveillance footage from the post office where the drug parcel was mailed. Case agents recognized HUANG as the person that mailed the drug parcel. HUANG fingerprints were also located on this parcel.

On November 21, 2023, case agents mailed $2,500 to "changpeng li, XX-X9 Union Street, Flushing NY" for the drug parcel LI and HUANG mailed to CS 3. On November 22, 2023, the controlled money parcel was delivered. XING texted CS 3 on November 22, 2023, "I think it's there" consistent with the parcel being received. CS 3 later informed the case agents that LI was indicating the money did not arrive. On November 28, 2023, CS 3 contacted LI. CS 3 told XING the money was sent to XX-X9 Union Street, Flushing NY. LI indicated he would call and check. CS 3 requested another "hundred" be sent (100 grams of ketamine) and LI agreed.

### e. January 8, 2024 Controlled Buy

In January 2024, CS 3 again reached out to LI to obtain ketamine at the direction of case agents. CS 3 and LI agreed to mail cash for ketamine. On January 3, 2024, CS 3 sent LI a screenshot of the tracking number for the money parcel, which was mailed to Yanlingpei, XX3 Henry St apt X, New York (identified as HUANG's address). On January 7, 2024, CS 3 texted LI that the parcel was delivered. On January 8, 2024, LI texted CS 3 "I got it". CS 3 requested LI mail the ketamine to "Sam Wilson" at XXX8 West Van Beck Avenue, Milwaukee Wisconsin, as arranged by case agents. On January 12, 2024, case agents intercepted a parcel to "Sam Wilson" which contained 109 grams of ketamine in a black plastic bag. Case agents obtained video from the post office in New York, where the parcel was mailed. Case agents recognized HUANG placing a black plastic bag into a flat rate envelope and mailing the parcel.

## B. Search Warrants / Consent Search

### a. Traffic Stop

On September 10, 2021, Hobart Indiana Police pulled over Dahai Wang due to a traffic violation. Eventually WANG, through a Google Translator, consented to the search of the vehicle. Police located $122,530 inside the vehicle. Based on a license plate check, police knew

the vehicle was in Milwaukee, Wisconsin before being stopped. Wang admitted that "Li" (later identified as LI) paid him $2000 to transport the money from Wisconsin back to New York.

### b. WNUK's residence

On February 17, 2022, a state search warrant for WNUK's house (XX57 North 106th Street, Milwaukee, Wisconsin 53225) was executed. Case agents located the following items during a search of WNUK's house:

a. over $9,600;
b. an electronic scale;
c. multiple cell phones;
d. drug paraphernalia;
e. THC wax/marijuana;
f. 644.6083 grams of ketamine (confirmed by WI crime lab);
g. 55.8483 grams of ketamine (confirmed by WI crime lab);
h. 96 pills (one confirmed to be LSD by WI crime lab with a weight of .2497 grams – estimated 23.9 grams total);
i. THC edibles;
j. a Glock 45 9mm, bearing serial number BNWA275;
k. a Glock 17M 9mm, bearing serial number BENS974, with a Glock switch;
l. Bersa Thunder 380, bearing serial number G48024,
m. a Glock 17 9mm, bearing serial number AUC207;
n. and ammunition.

### c. SENTER'S vehicle and residence

On March 10, 2022, case agents executed a federal search warrant of SENTER's Toyota after he was returning to the Milwaukee area from Chicago, Illinois near Kenosha, Wisconsin. Case agents recovered two suitcases in the back of the vehicle that contained the following:

a. 260 grams of THC edibles;
b. 3,575 grams of MDMA;
c. 2,045 grams of powder ketamine; and
d. 21,110 grams of liquid ketamine.

The DEA crime lab tested portions of the suspected controlled substances as a represented sample of the suspected controlled substances seized. The DEA crime lab indicated the sample of powder was 995.9 grams and 248.5 grams of ketamine. As to the liquid substance, the DEA crime lab indicated the sample was 680.4 grams of ketamine. As to the suspected MDMA, the DEA crime lab indicated there was 1,455.5 grams of MDMA. It was also later determined that SENTER's vehicle had a hidden compartment; however, no additional drugs were in the compartment.

That same day, case agents conducted a federal search warrant on SENTER's residence (XX05 South 3rd Street, Milwaukee, Wisconsin). Inside SENTER's residence case agents located the following:

    a. 4.1 grams of suspected Marijuana (with packaging);
    b. a blue/black Model 17C Glock 9mm, bearing serial number EDL252, with a Glock auto-sear switch and an empty extended magazine[1];
    c. Galls Body Armor (Ballistic Vest);
    d. 70 grams of suspected Marijuana;
    e. Psilocybin (Mushrooms);
    f. THC Edible Candy Bar;
    g. 48.6 grams MDMA (DEA crime lab confirmed);
    h. 312.1 grams of MDMA (DEA crime lab confirmed); and
    i. 5.5 pounds of suspected Marijuana.

### d. THORNTON'S Drug Parcel

On April 26, 2022, case agents intercepted a parcel from Ridgewood, New York to Shelton THORNTON, 294 Red Tail Trail, Colorado. Case agents obtained a federal search warrant for the parcel and located inside was 510 grams of suspected ketamine. It is important to note that this drug parcel was from not from LI, rather, it was from a different drug source.

### e. BLANDIN's Residence

On November 4, 2022, case agents conducted a search of BLANDIN's residence (XXX2 XXXXX3 Rockfield Rd, Germantown, Wisconsin). Inside, case agents located the following:

    a. 42.6 grams of ketamine;
    b. 370.9 grams of THC concentrate (wax);
    c. 06.5 grams of THC plant material (flower);
    d. 338 THC cartridges;
    e. 20 packages of THC edibles (gummies); and
    f. several pieces of drug paraphernalia to include rolled currency with powder, mirror with powder, muddler with powder, digital scale, baggies, THC smoking devices and drug storage containers.

## C. Statements by Defendants

### a. WNUK

During a *Mirandized* interview WNUK identified SENTER as his drug supplier. WNUK stated that SENTER's drug supplier was from New York, and known to WNUK as "Li", later identified as Xing LI. WNUK explained that SENTER generally met with an associate of LI,

---

[1] On March 31, 2022 DCI SA Alexander BOL tested the Glock. The results of this test showed this weapon was an automatic handgun/ machinegun, meaning with each press of the trigger, several rounds were fired automatically.

who case agents later identified as HAUNG, in Chicago, IL. They exchanged large amounts of cash and narcotics in suitcases while staying at a hotel within the city.

### b. SENTER

During a *Mirandized* interview, SENTER admitted to dealing drugs. SENTER described obtaining multiple kilogram quantities of ketamine and MDMA on a near monthly basis for the past three years from "Li", later identified as Xing LI. SENTER would meet a courier in Chicago to receive the narcotics and deliver cash to the courier on behalf of the supplier located in New York. SENTER also traveled to New York City to obtain controlled substances from LI. SENTER stated "Skinny Boy", identified as Kaiyu HUANG, would deliver controlled substances and obtain drug proceeds for LI.

SENTER would "front" WNUK ketamine and would receive payment from WNUK sometime after providing him with narcotics.

SENTER stated he would pool his money with EISENHAUER to purchase kilograms of ketamine. SENTER stated EISENHAUER also sells cocaine. SENTER stated he observed a quarter kilogram of cocaine inside EISENHAUER's residence sometime in the past six months.

SENTER stated John PERRY would purchase kilograms of ketamine from SENTER.

SENTER identified Shelton THORNTON as another individual SENTER would "front" drugs too. SENTER stated THORNTON currently owed him $30,000 for a kilogram of ketamine. SENTER stated that THORNTON currently lives in Colorado and is the source of the acid tablets that SENTER had in his bedroom. SENTER did confirm that he had received two Western Union wire transfers from THORNTON, in the past, for the purchase of a kilogram of ketamine. SENTER explained that he drove the kilogram of ketamine out to Colorado for THORNTON.

SENTER also identified Skylar TRUMBO as one of the individuals he would pool his money with to obtain large amounts of controlled substances.

### c. HUANG

During a *Mirandized* interview, HUANG admitted to being engaged in drug trafficking with LI. HUANG stated LI is the boss of the operation and supplies HUANG with drugs to deliver. HUANG stated he receives about $1000-$2000 per day salary for drug trafficking with LI. HUANG stated the price for ketamine goes from $9,000-$10,000 a kilogram.

### d. BLANDIN

BLANDIN provided a *Mirandized* statement and admitted to having a bunch of carts, wax, weed, gummies, and ketamine at his home. BLANDIN stated he picked up the ketamine the previous night in Illinois and believed it weighed about 28 grams. BLANDIN denied selling

drugs out of his home, which was inconsistent with controlled buys and surveillance, and would not provide information as to his drug source.

### e. TRUMBO

TRUMBO provided a non-custodial statement to case agents. TRUMBO admitted to buying drugs from SENTER for a few years. TRUMBO stated he began to buy kilograms of ketamine from SENTER a couple years ago. TRUMBO stated he obtained a kilogram of ketamine once or twice a month. TRUMBO was present when SENTER picked up the ketamine in Chicago. TRUMBO stated SENTER's ketamine supplier is "Li", but TRUMBO never met "Li". TRUMBO stated WNUK and EISENHAUER travelled to New York for SENTER to obtain drugs. TRUMBO received ½ kilogram of ketamine from them after one trip from New York.

TRUMBO stated he owes SENTER $25,000 for drugs he previously received. TRUMBO stated he obtained the ketamine from SENTER just before his arrest in March 2022. TRUMBO met SENTER at SENTER's parents' home in Illinois and was fronted the ketamine.

### D. Electronic Devices

Case agents also conducted several phone extractions and obtained evidence consistent with LI, HUANG, SENTER, WNUK, EISENHAUER, THORNTON, TRUMBO, PERRY, and BLANDIN engaged in drug trafficking.

For example, on Senter's cellphones case agents located messages between SENTER and LI regarding the sale of ketamine, MDMA (Molly) and marijuana (weed) in bulk amounts. In one such exchange, SENTER and LI discussed a transaction in which SENTER asks for 15 kilograms of (ketamine) for $415,000.

Case agents located messages between SENTER and THORNTON's girlfriend showing proof of payment for controlled substances. Case agents also located messages between SENTER and BLADIN regarding drug transactions.

Case agents reviewed a picture of WNUK and SENTER timestamped June 19, 2021, at 7:48 p.m. and a location of "East Broadway" New York. CS1 stated that this picture was taken during a drug trafficking trip to obtain multiple kilograms and explained that they drove to New York in SENTER's Toyota 4Runner and stayed at an unknown hotel.

### E. Confidential Sources

As part of the investigation into the DTO, case agents interviewed several confidential sources regarding their knowledge of the drug trafficking organization:

### a. SENTER, EISENHAUER, and LI

CS1 stated WNUK traveled to New York on three separate occasions for the sole purpose of buying ketamine or MDMA from SENTER's source, identified as LI. Two of these trips were with SENTER in 2021. A third trip in 2021 was with a subject case agents identified to be Kevin EISENHAUER.

CS2 stated since around 2016 SENTER was selling ketamine. CS2 stated that in approximately March 2021, SENTER was fronting kilograms of ketamine to DTO members. CS2 identified LI as SENTER's drug source and stated SENTER, WNUK and others would travel to New York to obtain both powder and liquid ketamine in gallon size bags. CS2 identified at least four drug pick up trips to New York conducted by the SENTER DTO starting in March of 2021 and ending in May of 2021.

CS2 stated SENTER traveled to Chicago to obtain controlled substances from LI, including MDMA. CS2 identified at least three trips SENTER took to Chicago to obtain controlled substances.

CS3 stated SENTER sold large amounts of MDMA and Ketamine since at least 2019.

CS4 stated that WNUK and EISENHAUER would all give money to SENTER to purchase multiple kilograms of ketamine and MDMA from SENTER's source in New York, later identified as LI.

### a. TRUMBO

CS1 stated that TRUMBO was a kilogram-level ketamine customer of SENTER, who resided in Chicago. CS1 stated after a trip to New York, WNUK and SENTER delivered a kilogram of ketamine to TRUMBO.

CS2 stated TRUMBO had been arrested while in possession of ketamine that TRUMBO had received from SENTER.

### b. PERRY

CS1 stated PERRY picked up a kilogram of ketamine from SENTER at least once.

CS2 stated he/she was present when PERRY purchased a half kilogram of cocaine.

### c. EISENHAUER

CS1 stated Kevin EISENHAUER and WNUK traveled to New York to obtain kilograms of ketamine for SENTER. Case agents located a photo of WNUK and EISENHAUER that had a timestamp of March 11, 2021, at 9:32 PM. The location stamp of this picture showed "Flushing - Main St". CS1 stated that a few days before this trip, SENTER asked WNUK to accompany EISENHAUER to New York. WNUK and EISENHAUER were supposed to pick up 4 kilograms of powder ketamine, but when LI arrived, he had one kilogram of powder ketamine and three kilograms of liquid ketamine. EISENHAUER spoke with SENTER about the incorrect order,

who spoke with LI. An agreement was reached, and LI left. CS1 stated that LI returned with three kilograms of powder ketamine and one kilogram of liquid ketamine, which were sold to WNUK and EISENHAUER. CS1 stated WNUK and EISENHAUER each took one kilogram of ketamine and SENTER took two kilograms.

CS4 stated that EISENHAUER sold both cocaine and ketamine. CS4 stated EISENHAUER would sell CS4 anywhere from between one ounce to nine ounces of cocaine. CS4 stated EISENHAUER also sold CS4 ketamine by the ounce.

### d. BLANDIN

CS1 stated BLANDIN would obtain ketamine from SENTER, but when SENTER did not have any ketamine, BLANDIN would purchase ounce quantities of ketamine from WNUK.

### e. THORNTON

CS4 stated THORNTON was a kilogram level ketamine customer of SENTER. CS4 stated THORNTON would also purchase small amounts of cocaine when he came to SENTER's house for ketamine.

### E. Admission

THORNTON now admits and acknowledges that he conspired to knowingly and intentionally distribute and possess with the intent to distribute ketamine and THORNTON between at least January 2021 and April 2022, in the Eastern District of Wisconsin and elsewhere. Based on the controlled substances seized during the investigation, the defendants' *Mirandized* statements, debriefs, phone extractions and other admissible evidence, it is estimated that THORNTON is responsible for 15,000 units of ketamine. THORNTON admits that he conspired to distribute and possess with the intent to distribute at least that quantity of ketamine between January 2021 and April 2022.